**IN THE COURT OF APPEALS OF IOWA**

No. 21-0177
Filed November 3, 2021

**IN RE THE MARRIAGE OF CASSANDRA SUE ALBER
AND THOMAS ALBER**

**Upon the Petition of
CASSANDRA SUE ALBER,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning
THOMAS ALBER,**
        Respondent-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Boone County, Christopher Polking,

Judge.


        The former husband appeals the decree dissolving his marriage.   The

former wife cross-appeals.  **AFFIRMED ON APPEAL; AFFIRMED AS MODIFIED**

**ON CROSS-APPEAL AND REMANDED.**


        Patrick H. Payton of Patrick H. Payton & Assoc., P.C., Des Moines, for

appellant.

        Nicole S. Facio of Newbrough Law Firm, LLP, Ames, for appellee.


        Considered by Tabor, P.J., Greer, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**TABOR, Presiding Judge.**

Cassandra and Thomas Alber divorced after eighteen years of marriage. The decree ordered Cassandra to pay spousal support and Thomas to pay child support. Thomas appeals the decree contending the property division was inequitable, the spousal support was too low, the child support was too high, and the award of attorney fees fell short. Cassandra cross-appeals arguing the property division was inequitable to her and the spousal support award should be reduced or eliminated.

Persuaded by Cassandra's argument on spousal support, we modify the decree to reduce the amount of the award. We do so because Thomas did not contribute to Cassandra's career advancement. And in the words of *In re Marriage of Mann*, Thomas has been "both economically underemployed and domestically underemployed." *See* 943 N.W.2d 15, 22 (Iowa 2020). We affirm the other provisions of the decree but remand for recalculation of Thomas's child support obligation going forward based on the modified spousal support award.

## I. Facts and Background Proceedings

Cassandra earned her bachelor's degree in Iowa but met Thomas in Tempe, Arizona, where she was starting out as a teacher. Thomas—who had a high school diploma and some college credit—owned and operated a 7-Eleven gas station. They married in 2002. Thomas's then ten-year-old daughter lived with them. One year later, Cassandra finished her master's degree in education at Arizona State University. That same year, Thomas sold his gas station to open a franchise restaurant. Close on the heels of that change, in 2004, Thomas and

Cassandra had their daughter, C.A. Unfortunately, their new business venture soon failed, and they filed for bankruptcy in 2005.

After the bankruptcy, Thomas took a job as an assistant manager at a QuikTrip earning around $45,000 per year. His mother died in 2008, leaving him an inheritance of roughly $60,000, which he placed in a separate bank account. In 2014, Thomas was fired from QuikTrip. He then decided to switch careers, securing a position as a bus driver in the school district where Cassandra worked. As a driver, he earned between $24,000 and $27,000 per year.

Throughout most of their marriage, Cassandra and Thomas maintained separate bank accounts. From his accounts, Thomas covered the mortgage on the Arizona house, his vehicle payments, and his credit card debt. After being fired from QuikTrip, Thomas paid the mortgage with his inheritance. Cassandra paid all other expenses for herself, the children, and the household. She also was responsible for her student loans and her own credit card debt.

Acting on a friend's tip that she could earn more as a teacher in Iowa, Cassandra started looking for employment back home. In 2016, she received the offer for her current position in Boone at a rate $30,000 above her Arizona salary. Considering Cassandra's lucrative offer, Thomas agreed to the move. The couple was also motivated to relocate because Cassandra's parents were returning to Iowa for health reasons.

After relocating to Iowa, the couple sold their Arizona house, receiving proceeds of $46,000. Thomas deposited $25,000 of those proceeds into his inheritance account to "pay back" the mortgage costs. The parties used the rest as a down payment on a house in Madrid, Iowa.

From his account, Thomas paid the cell phone and cable bills, his car payment, and his credit card bills. Cassandra covered everything else. She supplemented her teacher income by coaching speech and debate and other contract-based positions. To earn extra cash, Cassandra became a consultant for Thirty-One, a direct-sales business dealing in purses and organizational items. Outside the academic year, she taught summer school and worked other jobs. By the time of the dissolution trial in December 2020, she had reached the top of her teacher pay scale, earning around $90,000 per year. She did not expect her salary to go up except for cost-of-living increases. At that point, she was forty-nine years old, in good health, and expected to retire at age sixty-five.

Once in Iowa, Thomas started driving a bus for the Johnston school district. He worked thirty hours per week earning around $32,000 per year, which was more than the Arizona school district paid him. Sometimes, he would drive for field trips, but he did not work in the summers, when he received unemployment benefits.

In early 2020, the couple separated. Thomas moved back to Arizona where his older daughter and two brothers lived. He secured another job as a school bus driver, but earned a base salary of only $20,575, working thirty-hour weeks for ten months of the year. He had little opportunity for extra routes, and he did not pursue other income outside the academic year. In Arizona, he was not eligible for unemployment during the summer. But during the COVID-19 pandemic, he received unemployment benefits totaling $5000. He testified that he deposited that income in his account and did not disclose it in his financial affidavits.

Thomas's career choices are limited by his physical condition. He has had two spinal surgeries, a knee replacement, and ongoing back pain. He was set to undergo fusion surgery on his neck soon. He testified he cannot do a job that requires him to stand or sit all day. He also testified he likes driving a school bus because he enjoys being with children, having "fresh air every day," and getting to "move around." At the time of trial, he was sixty-four years old. He anticipated taking his social security benefits at sixty-six years four months. He will be seventy-nine when Cassandra expects to retire.

Over their marriage, the parties accumulated significant credit card debt and little savings other than Cassandra's pension plan through the Arizona State Retirement System. Cassandra also has an IPERS plan for her teaching in Iowa. Thomas has a 401k plan from the years he worked for QuikTrip.

When Thomas moved back to Arizona, sixteen-year-old C.A. stayed in Cassandra's physical care. That care arrangement reflected the pattern through the marriage. Cassandra provided child care even when Thomas worked thirty-hour weeks and had summers off. When her duties coaching debate took her out of town, Cassandra had to look for someone else to care for C.A.

In January 2020, Cassandra petitioned for divorce. She and Thomas sold their Madrid house, putting the proceeds into a trust account. They split up their personal belongings and agreed on C.A.'s physical care. After a trial on the remaining issues, the district court found, "Other than retirement accounts, the parties have little property to distribute." Each party kept their own bank accounts. The decree also awarded the parties their own cars and any debt remaining on them, as well as their separate credit card debt. Because Cassandra took on much

more credit card debt, the court awarded her the Madrid house sale proceeds, $11,238. The court divided Cassandra's two pension plans according to the *Benson* formula.[1] It also ordered Thomas to transfer $31,000 from his QuikTrip 401k plan, containing $100,179, to Cassandra. That amount reflects less than half the value because Thomas will need the cash from his pension earlier while Cassandra will receive her pension benefits upon her retirement. For reference, the court distributed the marital estate like this:

| | Cassandra | Thomas |
|---|---|---|
| **Assets** | | |
| House sale proceeds | $11,238 | |
| 2015 vehicle value | (1392) | |
| 2019 vehicle value | | 3179 |
| QuikTrip 401K | 31,000 | 69,179 |
| Thomas's bank accounts | | 4573 |
| Cassandra's bank accounts | 147 | |
| Arizona State Retirement System pension | TBD by *Benson* formula | TBD by *Benson* formula |
| IPERS | TBD by *Benson* formula | TBD by *Benson* formula |
| Unemployment insurance | | 5000 |
| | | |
| **Debts** | | |
| Thomas's credit card debt | | (5155) |
| Cassandra's credit card debt | (24,507) | |
| | | |
| **Total:** | 16,486 | 76,776 |

Because Cassandra had physical care of C.A., the court ordered Thomas to pay $795 in monthly child support. In turn, it ordered Cassandra to pay $1000

---

[1] The *Benson* formula is a way to determine one spouse's share of any payout of matured benefits of a pension. *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996). The formula takes the proportion of the married years of the plan over the number of years covered by the plan and gives the payee half that proportion of the monthly benefit. *Id.*

in monthly spousal support until her retirement, Thomas's remarriage, or their deaths. Finally, the court awarded Thomas $3000 in attorney fees.

Thomas appeals, and Cassandra cross-appeals.

## II. Scope and Standard of Review

The district court tries dissolution-of-marriage cases in equity. *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). So appellate review is de novo. Iowa R. App. P. 6.907. Under that review, we give weight to the district court's fact findings, but they do not bind us. *Id.* Prior cases offer little precedential value because equitable results hinge on the particular circumstances of the parties before us. *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983). We afford the district court considerable latitude in determining spousal support and will disturb that determination only when the court fails to do equity. *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015).

## III. Analysis

### A. Property Division

Both Thomas and Cassandra contest the property division. Familiar principles govern their claims. "[M]arital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21[(5) (2020)]." *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). "An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets." *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013).

Thomas contends two aspects of the property division were unfair. First, he believes the court should have split the Madrid house proceeds equally. Second, he argues the court erred in awarding Cassandra $31,000 from his

QuikTrip 401k now but making him wait for his share of her Arizona pension. On cross-appeal, Cassandra contends she should have been awarded $60,000 of the QuikTrip 401k.

To start, the court gave this rationale for awarding Cassandra all proceeds from selling the Madrid home:

> Cassie is receiving more debt, so the court believes she should also receive the liquid proceeds of the house sale. Thomas will still be receiving more property overall, and for the reasons stated above he will be awarded a larger share of his QT 401(k). The court believes that traditional alimony is warranted, but takes this property distribution into account when setting the amount at $1,000 per month.

Thomas characterizes that reasoning as "unsatisfactory"—pointing out the parties kept their finances separate, including credit card and other debts. He argues the parties accepted that "financial arrangement" and "both contributed to the accumulation of this asset." In his view, the court should have divided the house sale proceeds fifty-fifty.

Although "'it is generally recognized that equality is often most equitable' . . . 'equitable distribution depends upon the circumstances of each case.'" *In re Marriage of Mrla*, No. 19-1222, 2020 WL 5229197, at *2 (Iowa Ct. App. Sept. 2, 2020) (quoting *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007), and *Hansen*, 733 N.W.2d at 702). Thomas focuses narrowly on one asset and ignores the other assets and debts that formed the property division. The overall distribution, while not equal, was equitable in accounting for Cassandra's practice of shouldering more of the family credit card debt. She also owed more on her vehicle than it was worth, while Thomas received a more valuable vehicle. Thomas relies on the parties' habit of keeping their bank accounts and credit cards

separate to justify assigning a greater portion of marital debt to Cassandra. But that approach does not achieve equity because Cassandra amassed the credit card debt paying for household expenses and caring for the parties' children.

In her cross-appeal, Cassandra argues the property division was not fair to *her* because she leaves the marriage with much less than Thomas. She received about $16,500 in marital assets and Thomas received nearly $77,000. She acknowledges the court may have considered the difference in their ages and Thomas's more immediate need for cash. Indeed, the court recognized the factors in section 598.21(5) by awarding Thomas a more generous share of the marital estate because he was fifteen years older than Cassandra, nearing retirement and had diminished health and lacked earning capacity. Despite the gulf between the awarded assets, given the circumstances, we conclude the property division is equitable and will not disturb it.

Thomas also contends the district court should have given him immediate access to his share of Cassandra's Arizona pension. He argues it was inequitable to split his QuikTrip 401k right away but postpone division of Cassandra's Arizona pension. He points out that, unlike her IPERS which she is still paying into, Cassandra had stopped working in Arizona and contributing to that pension. He believes he should receive his share now rather than waiting until Cassandra retires. He notes that when Cassandra is sixty-five, he will be "eighty years old or possibly even deceased."

Cassandra responds that the Arizona pension is a defined-benefit plan like IPERS and Thomas inappropriately uses the refund value to calculate his share. If he takes his share now, it would lessen the benefit amount they are due to

receive at Cassandra's retirement. Cassandra also argues the court should have awarded her $60,000 of the QuikTrip 401k to equalize the property distribution and to account for $5000 of unemployment insurance income Thomas failed to disclose earlier. The court reasoned:

> the most equitable result can be achieved in leaving the Arizona State retirement as a pension subject to the *Benson* formula, and giving Thomas a greater share of his QT 401(k), which he can access earlier than Cassie without penalty. While this results in a property distribution that is unequal, the court finds it most equitable under the all the factors in this case.

Like the district court, we find decreasing the value of retirement benefit from Cassandra's pension, which she worked eighteen years as a teacher to accrue, is inequitable to her. The court balanced the ledger by allowing Thomas to retain a larger share of his 401k to access in the more immediate future. Thomas also is receiving spousal support to help him through what the district court called "the otherwise difficult period over the next fifteen years before Cassie reaches her retirement age and the state pensions become available." Despite the difference in their bottom lines, we think the court achieved equity in the property division.

## B. Spousal Support

### 1. Amount

Before granting spousal support of $1000 per month, the court discussed the parties' earning gap:

> Thomas is significantly older, closer to normal retirement age, in lesser health than Cassie, and with less education. With his age and physical limitations, there are not likely to be dramatic increases in his income. Cassie's income is much higher, and is likely to remain steady, with at least cost of living adjustments. The parties did not live extravagantly while married, in fact they tended to spend all that they earned, and managed by building up credit card debt repeatedly.

The court then addressed Thomas's need for support and Cassandra's ability to pay:

> [T]o even maintain such lifestyle as they had, Thomas' needs will outweigh his income for a number of years, and Cassie's ability to pay will be superior for a number of years. If the Arizona pension is left to have the Benson formula applied, the retirement incomes of the parties would become much more balanced when Cassie reaches retirement age.

In examining the district court's reasoning, we recognize it is in the best position to determine the question of alimony. So "we should intervene on appeal only where there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015). Marriages of a long duration—twenty or more years—merit consideration for traditional spousal support. *Id.* at 410–11. This marriage was not quite as long, but like the district court, we find traditional spousal support is warranted. *Mann*, 943 N.W.2d at 21 (marriage shorter than twenty years can support traditional alimony award under certain circumstances).

In determining the proper amount, we balance the ability of the higher earning spouse to pay against the needs of the other spouse. *In re Marriage of Tzortzoudakis*, 507 N.W.2d 183, 186 (Iowa Ct. App. 1993). We measure "need" objectively as what the spouse requires "to become self-sufficient 'at a standard of living reasonably comparable to that enjoyed during the marriage.'" *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 589.21A(1)(f)). We consider the factors listed in Iowa Code section 598.21A(1).

Thomas argues, "The disparity in the parties' earning capacity is great and there is no realistic feasibility of Thomas closing the gap." At the current rate, he

says he has only $204.84 per month in disposable income. He requests an increase in spousal support to $2000 until his child support obligation ends.

We would be more receptive to Thomas's argument if spousal support were his only source of income. But it is not. He has his own job. And after his retirement, he will draw social security and benefits from his QuikTrip 401k. Granted, Thomas is not in the best physical health. And he has little education beyond high school. So he will not likely increase his earning capacity in the short time before his retirement. On the spending side, Thomas submitted a financial affidavit with estimated monthly expenses of $2196. The district court added $1200 for Thomas to obtain his own residence in Arizona.[2]

In lobbying to reduce or eliminate spousal support, Cassandra highlights the similarities between her marriage and that examined in *Mann*. *See* 943 N.W.2d at 22. In *Mann*, the court determined the husband had no right to spousal support because he did not contribute to the wife's efforts to increase her earning capacity. *Id.* Like Cassandra, the wife came into the marriage with her degree. *Id.* And the husband did not contribute significantly to maintaining the household. *Id.* Also in *Mann*, the husband did not sacrifice his own career opportunities to manage the household or seek to expand his economic potential. *Id.* Yet he received substantial assets in dividing the marital estate because of the wife's "industriousness." *Id.* at 23.

The comparison to *Mann* is apt. Cassandra achieved a higher earning capacity by her own efforts with little support from Thomas. She worked full time

---

[2] At the time of trial, he was living with a friend.

as a teacher; her ambition for greater pay prompted the family's move from Arizona to Iowa. She also worked a second job and during the summers. On top of those efforts, she maintained a side business. Not only did she work hard outside the home, she provided daily care for both C.A. and Thomas's daughter.

By contrast, Thomas had not increased his earning capacity or contributed more to the household, either financially or in maintaining the home. After he was fired from his job at QuikTrip, Thomas chose to drive a school bus, which was not full-time employment. He did not sacrifice economic opportunities—the move to Iowa increased his income while he paid less of the household expenses. As Cassandra argues, Thomas is "very content to remain a bus driver" and has not pursued more income. After their separation, he returned to Arizona where he cannot take additional shifts or receive unemployment during the summers. Thomas defends his decision to drive a school bus. He testified he enjoys the work and the duties accommodate his physical impairments.[3]

At the same time, he enjoyed Cassandra's greater financial contributions to the household. Thomas also received more up-front assets from the property division and will retire with social security benefits and his 401k funds for about thirteen more years until Cassandra's support obligation ends and he starts receiving his share of her pensions. *See id.* 22–23 (considering property division in tandem with alimony award).

We understand traditional spousal support is designed to give receiving spouses the support they would have received had they stayed in the marriage.

---

[3] Thomas testified he cannot sit or stand for extended periods—but he has not filed for disability.

*Gust*, 858 N.W.2d at 411. But the primary considerations are the receiving spouse's need for support and the other spouse's ability to pay. *Id.*

Given Thomas's physical limitations and lesser earning capacity, we find some traditional alimony is warranted. *See In re Marriage of Towne*, ___ N.W.2d ___, ___, 2021 WL 3075938, at *6 (Iowa Ct. App. 2021) ("Age and physical health also favor a traditional spousal support award."). But to do equity between the parties, we must offset that need with Thomas's lack of interest in pursuing full-time employment during the marriage, as well as his recent move to Arizona where his salary was lower still. Because Thomas opted not to increase his earnings or work during the summer, we agree with Cassandra's contention that her support obligation is too high. Thomas testified he will retire when he turns sixty-six years old. He will then receive social security benefits and his 401k funds. And his child support obligation ends around that same time.[4] He also has around $20,000 from his inheritance. And we are mindful that under new federal income tax laws, spousal support payments are not tax deductible and payments received are not taxable, favoring the recipient, Thomas. *See Mann*, 943 N.W.2d at 21.

We find it equitable to reduce the amount of the spousal support to $750 dollars per month, as Cassandra suggested at trial. This reduction is effective as of the date of the decree. *See Thomas v. Minner*, 340 N.W.2d 285, 286 (Iowa 1983); *In re Marriage of Wegner*, 461 N.W.2d 351, 352 (Iowa Ct. App. 1990); *see also In re Marriage of Woolf*, No. 01-0878, 2002 WL 31525435, at *4 (Iowa Ct. App. Nov. 15, 2002). It is within our power as an appellate court to provide for a

---

[4] C.A. was a junior in high school when the decree issued in December 2020.

reduction in the future payments over the time span required to recapture Cassandra's overpayments resulting from our decision.[5]  *See Thomas*, 340 N.W.2d at 287.  To recoup any overpaid balance since the date of the decree, we order her payments be reduced to $500 per month starting from issuance of procedendo until Cassandra has recovered the excess amount.  At that point, her monthly alimony payments will be $750.

## 2. Duration

As one of the events terminating Cassandra's alimony obligation, the decree listed when she "turns 65 and becomes vested in her pensions."  In a motion to amend the decree, Cassandra asserted she "would like the opportunity to retire earlier than 65 years of age if the opportunity presents itself and if [she] starts drawing on her pension earlier than 65 years of age Thomas would also benefit by receiving his share of the pension benefits earlier."  She asked the district court to modify the decree to end her support obligation "at 65 years of age or when she begins drawing on her pensions, whichever is earlier."  Thomas resisted her motion but admitted "it would be advantageous to receive his share of the pension benefits earlier."

The district court denied the motion to amend, reasoning

Cassie seeks a modification in the ruling ending her spousal support obligation either at 65, as in the decree, or whenever she begins to draw her pensions, whichever is earlier, so that she can retire earlier than age 65 if she chooses.  This seeks a change in the current decree based on the future unknown occurrence or non-occurrence of certain events.  The court cannot know now whether her earlier retirement would come to pass, or what the health and income of the

---

[5] Assuming Cassandra has been making periodic spousal support payments under the decree since its entry on December 31, 2020, she has overpaid in the amount of $2750 ($250 times eleven months).

parties would be at the time, among other factors. Spousal support can be modified, and this issue is better left to a future modification action if needed based on the actual totality of the information at such future point.

On appeal, Thomas contends the court erred by terminating his spousal support upon Cassandra's anticipated retirement. Citing *Gust*, he contends "future retirement will ordinarily be considered to raise too many speculative issues to be considered in the initial spousal support award." 858 N.W.2d at 416.

If the termination provision was based on Cassandra's undesignated retirement date, Thomas would have a point. But it is not. It is evident from the court's denial of Cassandra's motion to amend that it intended to end her support obligation on a date certain: when she turned 65 *and* started drawing on her pensions.[6] In denying her motion, the court recognized the speculative nature of a retirement date. The court placed the onus on Cassandra to seek a modification

---

[6] The decree referred to Cassandra becoming "vested" in her pensions. But in the order denying Cassandra's motion to amend the decree, the court repeats this phrase from her motion: "whenever she begins to draw her pensions." Vesting and drawing benefits are different concepts. *See Pension*, Black's Law Dictionary 1155 (7th ed. 1999) (defining a "vested pension" as a pension in which the employee has rights to benefits purchased with the employer's contributions to the plan, even if the employee does not work for that employer at the point of retirement). Drawing, in this context, means to take out money. *See Draw*, Black's Law Dictionary 509. Like Thomas, we believe the district court intended to end his support obligation when Cassandra turned sixty-five and started collecting on her pensions. We make that small modification to the decree.

if she took early retirement. We reject Thomas's call to modify the duration of the obligation.

### C. Child Support[7]

Thomas asks for a variance from the child support guidelines, alleging that after he meets his $795 monthly obligation he is left with only $204 in disposable income. A variance is available only if the guideline amount would result in substantial injustice for the payor, payee, or the child, or to do justice under the special circumstances of the case. *See* Iowa Ct. R. 9.11. Neither of those grounds applies here. So we reject Thomas's request for a variance.

But given our modification of the spousal support award, we do remand for the district court to recalculate Thomas's obligation for the remaining months that C.A. is eligible to receive child support. *See, e.g.*, *In re Marriage of Brown*, No. 19-0705, 2020 WL 569344, at *7 (Iowa Ct. App. Feb. 5, 2020) ("Our modification of the spousal-support award of the decree necessitates a recalculation of child support.").

### D. Trial Attorney Fees

Finally, Thomas contends the district court erred in awarding only $3000 of the $5000 he requested in trial attorney fees. An attorney-fee award must account for the parties' respective needs and abilities to pay. *In re Marriage of Lattig*, 318 N.W.2d 811, 817 (Iowa Ct. App. 1982). We afford considerable discretion to the

---

[7] Thomas contends child support is reviewed for errors at law, citing *In re Marriage of McCurnin*, 681 N.W.2d 322, 327 (Iowa 2004). But we agree with Cassandra's reading of *McCurnin*, that interpretation of the Child Support Guidelines is not a question here, only their application. *See* 681 N.W.2d at 327. So our review remains de novo.

district court's accounting. *In re Marriage of Schettler*, 455 N.W.2d 686, 689 (Iowa Ct. App. 1990). Thomas asserts Cassandra caused more fees to accrue by refusing to negotiate, switching law firms, and changing her position on certain provisions. At bottom, we do not find her conduct amounted to "frivolous litigation tactics" as Thomas alleges. We thus decline to increase the fee award.

### E. Appellate Attorney Fees

Thomas requests appellate attorney fees. That award is not a matter of right but rests within our discretion. *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request must defend the decision. *See id*. Because Thomas did not prevail in his appeal, and Cassandra—who has a greater ability to pay—had success in her cross appeal, we order both parties to pay their own fees.

**AFFIRMED ON APPEAL; AFFIRMED AS MODIFIED ON CROSS-APPEAL AND REMANDED.**